# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### May 3, 2016 Session

## STATE OF TENNESSEE v. ANTOINE PERRIER

**Appeal from the Criminal Court for Shelby County**
**No. 10-07294      W. Mark Ward, Judge**

---

**No. W2015-01642-CCA-R3-CD  -  Filed September 6, 2016**

---

The Defendant-Appellant, Antoine Perrier, was convicted in the Shelby County Criminal Court of attempted voluntary manslaughter in Count 1, employment of a firearm during the attempt to commit a dangerous felony in Count 2, aggravated assault in Counts 3 through 7, and assault in Count 8.  The trial court merged Count 3 with Count 1 before sentencing Perrier to an effective sentence of thirty years.  In this delayed appeal, Perrier argues:  (1) the trial court erroneously instructed the jury on self-defense; (2) the trial court committed plain error in failing to instruct the jury on possession of a firearm during the attempt to commit a dangerous felony as a lesser included offense of employment of a firearm during the attempt to commit a dangerous felony; (3) the employment of a firearm count is void because it fails to name the predicate felony for the firearm offense; (4) the trial court erred in declining to instruct the jury on the defense of necessity; and (5) the evidence is insufficient to sustain his conviction for assault.  We conclude that although the self-defense instruction was erroneous, the error was harmless.  Therefore, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Lance R. Chism (on appeal) and Robert Brooks (on amended petition and delayed motions for new trial), Memphis, Tennessee, for the Defendant-Appellant, Antoine Perrier.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Omar Malik, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Procedural History and Facts.**  In November 2010, the Shelby County Grand Jury indicted Perrier[1] for attempted second degree murder in Count 1, employment of a firearm during the attempt to commit a dangerous felony in Count 2, and aggravated assault in Counts 3 through 8.  Following a jury trial, Perrier was convicted of the lesser included offense of attempted voluntary manslaughter in Count 1, the offenses as charged in Counts 2 through 7, and the lesser included offense of assault in Count 8.  In Perrier's first appeal, this court affirmed Perrier's convictions and sentences.  State v. Antoine Perrier, No. W2011-02327-CCA-MR3-CD, 2013 WL 1189475, at *1 (Tenn. Crim. App. Mar. 22, 2013), app. dismissed (Tenn. Feb. 7, 2014).  Because the issues raised in this appeal are fact-intensive, the following review of the facts as summarized in Perrier's direct appeal is necessary:

> Sadak Sharhan, the owner of the Miracles Mini Market, testified that he was working behind the cash register when eight-year-old [T.T.][2] ("victim"), the daughter of a customer, was shot in his store on the afternoon of February 13, 2010.  Sharhan said that at the time he heard the shots fired, one of his employees had just finished making a sandwich for Teone Vasser, one of his regular customers, who had been waiting outside the store.  He said three or four shots were fired during the incident.  Sharhan said that at the time of the shooting, Teone Vasser was with his brother, Anthony Vasser, who was also a regular customer.  He said that he had never had any trouble with either of these men in the past.  When Sharhan heard the gunshots, he immediately pressed the store's emergency button to summon the police.  He stated that the victim was standing near the deli counter at the time the shots were fired.  Sharhan did not see the person who fired the shots and did not hear anyone arguing prior to hearing the gunshots.  He said that the shots came from outside the store because the shots shattered the glass on the store's door before striking the victim inside the store.  Sharhan said he never saw anyone with a gun inside the store.

---

[1]  We acknowledge that we do not use titles when referring to every witness.  We intend no disrespect in doing so.  Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended.  He would prefer that every adult witness be referred to as Mr. or Mrs. or by his or her proper title.

[2] It is the policy of this court to identify minor victims and their family members by their initials only.

On cross-examination, Sharhan stated that he remembered seeing Perrier, the Defendant-Appellant, in his store the day of the shooting. He reiterated that he did not hear anyone arguing in his store the day of the shooting but acknowledged that he was standing behind bulletproof glass at the time.

[T.S.] testified that she was inside Sharhan's store when her daughter, [T.T.], was shot. [T.S.] stated that as she was standing in line at the store, a young woman who was trying to buy beer left the store to retrieve her license from her car, and Perrier, who was with the woman, decided to buy the beer for her. [T.S.] allowed Perrier to check out in front of her. Then a tall man, later identified as Teone Vasser, who was standing at the store's door, began to argue with Perrier. [T.S.] said she was not paying very close attention to the argument between the two men because it "didn't seem that serious." She said she approached the cashier and saw Teone standing just inside the store's front door just before shots were fired "all over the place." [T.S.] said that she heard four gunshots but never saw the gunman.

On cross-examination, [T.S.] said that she heard Perrier and Teone arguing but that she could not hear the subject of their argument. [T.S.] stated that Perrier left the store and that Teone stood at the store's door holding it partially open as he continued to argue with Perrier. She said Teone "was kind of agitated" but did not appear to be seriously angry. A few seconds later, [T.S.] heard the gunshots. She said that at the time that the shots were fired, her daughter was standing behind Teone, who was still standing at the store's door. [T.S.] said that she never saw anyone with Teone and that Teone never left the store. In addition, she said she never saw Teone or Perrier with a gun. After the shooting, Teone had bullet holes in his clothes.

On re-direct examination, [T.S.] said that she never saw Anthony inside the store the day of the shooting. She also said she never heard Teone mention a gun and never heard him threaten to use a gun the day of the shooting.

[T.T.], the victim, testified that during the February 13, 2010 shooting, one bullet went through her hand and two other bullets grazed her stomach and leg. She said she was hospitalized for three days for her injuries. The victim said she remembered two men arguing the day of the shooting. She said the argument started inside the store and then continued

-3-

outside. Shortly thereafter, she realized that she had been shot. The victim said she did not see who shot her and did not see anyone with a gun that day.

On cross-examination, the victim stated that one of the men arguing was tall and the other man had "short little dre[a]ds in his hair." She said that when the argument started, the tall man was standing next to the food and the man with the short dreadlocks was by the cash register. She could not determine the cause of their argument. The victim remembered both men exiting the store and continuing to argue.

Teone Vasser testified that he was getting a sandwich at the store with his brother Anthony Vasser and Anthony's son, Darrius Boykin, when the victim was shot. He admitted that he had two prior 1997 felony convictions for theft of property and aggravated robbery. Teone said he was waiting on his sandwich inside the store and Anthony was outside the store because he had already made his purchases. Teone first saw Perrier before he ordered his sandwich. Perrier was in front of him in line and was about to buy a beer, but he did not have his identification. Perrier's girlfriend offered to get his identification from the car, and when she re-entered the store, Anthony held the door open for her. Teone said that the girl had a "real big booty" and that he and his brother were ogling her. When Perrier saw Anthony staring at his girlfriend, he began talking to her about it and began cursing. Perrier and his girlfriend left the store and got into his girlfriend's green Blazer that was parked in front of the store's door. Perrier got into the Blazer and closed the passenger door.

Teone said he went to the store's door, opened it slightly, and asked his brother if he had said something to the girl because Perrier had been "acting real belligerent about somebody looking at his girl." At the time, Anthony was standing to Teone's right and Boykin was standing to his left just outside the door. Anthony denied saying anything to the girl and then "tapped" on the hood of the Blazer, which caused Perrier's girlfriend to stop the car. Perrier jumped out of the vehicle, stood with one leg inside the car, and one leg outside the car, and began "cursing" and "hollering." Teone, who was still standing in the doorway to the store, said that Anthony was not angry but that he was trying to find out why Perrier was so mad. Anthony asked Perrier why he was "talking crazy in the store." Teone said that Perrier and Anthony were arguing but asserted that they were not being loud. Teone said he checked on his sandwich inside the store, went back to the store's door, and saw that Anthony and Perrier were

still arguing. Teone said that as he tried to get Anthony away from Perrier, Perrier began arguing with Teone. Teone told Perrier that he was not going to argue with him and did not have to explain anything to him. At the time, Perrier was standing right outside the Blazer with the passenger door open. Teone said that as he and Perrier continued to argue, Perrier pulled out a black, small caliber pistol from his pants and held it by his side. When Anthony told Perrier that "we don't play with pistols around here" and that "[w]e shoot folks around here," Perrier began firing his gun. At the time, Anthony was just outside the store's door and was standing right next to Teone, who was still standing in the store's doorway. Anthony pushed Teone back into the store and ran in one direction while Boykin ran in the other direction. Teone stated that the bullets from Perrier's gun went through the store's glass door and his own clothing before hitting the victim inside the store. Teone said he did not have a weapon the day of the shooting. He also said that Anthony and Boykin did not have weapons that day. Teone was unaware that Perrier had a gun until he began shooting. After firing the shots, Perrier jumped into the front passenger seat of the Blazer, and Perrier's girlfriend drove away. Later that day, Teone "[i]mmediately" identified Perrier as the shooter from a photo spread. He acknowledged that he had some marijuana in his possession at the time of the shooting, for which he was later convicted.

On cross-examination, Teone said he was not selling marijuana at the store the day of the shooting. He stated that Anthony had told Perrier that he had recently been released from prison and that he did not want any problems in an attempt "to calm the situation down." He also stated that Anthony backed away from Perrier after tapping on the hood of the Blazer.

Faith Taylor testified that she drove Perrier to get a beer at the store on February 13, 2010. When she left the store to get identification, Anthony became so distracted by her looks that he accidentally walked into the store's door. After Anthony exited the store, Taylor and Perrier laughed about Anthony running into the door. She said Perrier was not angry about Anthony ogling her. Taylor said Teone overheard Perrier telling another man that if Anthony "was going to look that hard he could have said something." She said that Perrier did not know Anthony or Teone and did not know that they were brothers. She admitted that she had seen Anthony and Teone at her apartment complex but asserted that she did not know their names. Teone immediately told Anthony what Perrier had said about him.

-5-

Taylor said that she was about to crank her engine to leave when Anthony "flagged" them down and started saying something. Perrier opened his door and asked Anthony what he said. When Taylor realized that Perrier was getting out of her car, she tried to grab his shirttail in an attempt to stop him because she thought the argument was "getting a little bit more intense" and she "was a little worried [about] what might happen." Taylor said that Perrier did not appear to be angry when he opened the car door and began talking with Anthony. She said Perrier stood just outside her Blazer with the door open before he began walking towards the three men. She said that they continued to argue, although she could not make out what they were saying to one another. Taylor said that at that point, Anthony and another man were outside the store's door, and Teone came outside and stood next to Anthony. When Anthony told Perrier that Teone had informed him about what Perrier had said about him, the argument "escalated." Then Teone told Perrier, "F[——] this N[ew] O[rleans] N[—]." She said that approximately ten seconds after he got out of her car, Perrier pulled a black, scratched up gun from the back of his pants and immediately fired three or four shots. She said that Perrier pointed the gun at Teone at the time he fired the shots. Taylor said she did not know Perrier had a gun that day. She also said she had not seen Teone, Anthony, or Boykin with a weapon in the store, and she had not heard them mention a gun during the argument.

Taylor said that after Perrier fired the shots, he got back into her car and told her to drive away. She said that she left the scene because she was "terrified" that the three men might shoot at them and because she was afraid that Perrier would get mad at her if she did not do what he said. Taylor said she drove them to her apartment. When they got upstairs, Perrier removed the clip from his gun and ran downstairs. As she looked out the window, Taylor saw the police looking at her Blazer. Perrier came back upstairs, and she went downstairs to talk to the police. Taylor told the police that Perrier had fired shots at the store next door and that she had driven away from the scene. She also told them that Perrier was in her apartment. She said that the police did not enter her apartment until several hours later and were unable to find Perrier because he had escaped by climbing through her attic and into the attic of another apartment unit. The police later found Perrier's gun behind her refrigerator. She said the police arrested Perrier two or three months after the shooting.

On cross-examination, Taylor acknowledged that Anthony and Teone were threatening Perrier "in a way" because they were confronting

him at the same time. She said that Perrier did not get out of her car until Teone came out of the store and said, "F[——] this N[ew]O[rleans] N[—]." At that point, Perrier fired the shots. She said that Anthony and Teone remained on the sidewalk in front of the store during the argument. She said that at the time of the shooting, she had been dating Perrier for a year and a half. She said that she had never known Perrier to be a violent person and that Perrier had never been violent with her.

On redirect examination, Taylor said she tried to get Perrier back inside her vehicle two different times, but he wanted to stay outside the vehicle so he could continue arguing with the men. On recross-examination, Taylor acknowledged that she would not have seen if Teone, Anthony, or Boykin reached for a gun because she was so focused on getting Perrier back inside her vehicle.

Ronald Weddel, an officer with the Memphis Police Department, investigated the February 13, 2010 shooting at the Miracles Mini Market. He stated that the police found one bullet fragment and three bullet casings, which indicated that at least three shots had been fired. Officer Weddel said that although the police were unable to initially find Perrier, the fugitive team arrested Perrier on June 26, 2010.

Perrier, the only witness for the defense, testified in his own behalf. He admitted that he had been convicted of felony theft approximately two years before this trial. Perrier stated that he went with Taylor to the Miracles Mini Market on February 13, 2010, to purchase a beer. Because Taylor had left her identification in the car, he decided to buy the beer for her. At the time, Perrier was standing in line behind a lady and her little girl, and the lady told him to pay ahead of her. Perrier said that when Taylor went outside to get her identification, Anthony was so distracted by her looks that he ran into the store's door. Upon Taylor's return to the store, he and Taylor began laughing about Anthony ogling her and running into the door. Perrier told Taylor, "[I]f [he] wanted to say something, he just could have said something to you, but I know how you look. You look pretty good. So I see what he was looking at." He said this conversation was overheard by Teone, although he did not know Teone or Anthony Vasser and did not know that they were brothers.

Perrier said he and Taylor exited the store and got into her Blazer. As Taylor was about to put the car in reverse, they were still laughing about Anthony running into the door at the store. Then Anthony, Teone, and

Boykin "flagged" them down as they were about to leave. Perrier said that he opened the Blazer's door and said to Anthony, "What's up[?]" Anthony asked Perrier if he had anything to tell him, and Perrier said he had just been telling Taylor that Anthony should have said something to Taylor instead of just looking at her. Then Teone came out of the store and told Anthony that he did not have to explain anything to this "B[——] A[—] N[———]." Perrier told Teone that he was being disrespectful, and Teone replied that he did not "give a d[——]" because Perrier was not from around there. Perrier said that he and Anthony had resolved their issue before Teone came out of the store and began cursing at him. At that point, Anthony told Teone that he did not have time for this argument because he had just gotten released from prison. Teone said, "Man, f[——] the n[—— ]. I don't give a f[——] about no n[——] like you. We shoot them." Perrier said that at that point, he was "on defense mode" and moved away from the vehicle to get away from Taylor in case the men started firing shots. Perrier said that he had a gun with him that day because he had gotten held up at gunpoint when he first came to the Memphis area and had made the decision to never let that happen again because he had two children. Perrier said that he had the gun in his jacket. Perrier told Teone, "What's up?" Teone cursed at him again and acted "like he was about to pull [out a gun] from his back pocket and that's when I shot him." Perrier asserted that he shot his gun in self-defense because he "feared that [Teone] was going to react with a gun." Perrier said, "I reacted. I shot and I left." He added, "I didn't just stay there and try to figure out what was going on because basically I didn't really understand what all this was about anyway." Perrier said that he initially got out of Taylor's Blazer because he wanted to see why Anthony flagged him down. He said that when Teone came out of the store and began cursing him, he became afraid.

Perrier said that he left the scene after firing the shots because he was "scared" and because he did not know what else to do. He said that he got really upset when he discovered that he had injured an eight-year-old little girl. Perrier said that he did not turn himself into the police because he knew he needed a lawyer but could not afford one and because he did not want to be represented by a public defender. When asked how he felt about what happened on February 13, 2010, he said, "If I could take it back, I would because look what I'm facing and this is not my M[odus] O[perandi]. I don't just go around doing stuff like this. I just don't[,] and if I [could] take it back, I would have a second thought about what I did."

On cross-examination, Perrier admitted that he never saw Anthony, Teone, or Boykin with a gun on February 13, 2010. He acknowledged that he knew that Sharhan, [T.S.], and [T.S.]'s daughter were inside the store when he fired his gun. He also acknowledged that he left the scene after shooting the eight-year-old victim and that he escaped from the police by crawling through the attic of Taylor's apartment into another unit. Perrier admitted that he hid from the police until he was arrested several months after the shooting.

Id. at *1-6.

Following entry of his judgments of conviction on June 6, 2011, Perrier filed an untimely motion for new trial on July 12, 2011. Id. at *8. The trial court denied his motion for new trial, and Perrier appealed, arguing: (1) the evidence was insufficient to sustain his convictions for attempted voluntary manslaughter and employing a firearm during the attempt to commit a dangerous felony; (2) the trial court erred in its instructions to the jury; and (3) the trial court abused its discretion in imposing consecutive sentencing. Id. at *1. Because Perrier's motion for new trial was untimely, this court concluded that all issues other than sufficiency of the evidence and sentencing were waived. Id. at *12. It then held that the evidence was sufficient to sustain Perrier's convictions for attempted voluntary manslaughter and employing a firearm, that the jury instructions regarding attempted voluntary manslaughter and felon in possession of a weapon did not constitute "plain error," and that the trial court did not abuse its discretion in imposing consecutive sentences. Id. at *11-14.

On April 15, 2014, Perrier filed a pro se petition for post-conviction relief, alleging that both trial counsel and appellate counsel provided ineffective assistance. The trial court appointed private counsel to represent Perrier, who filed an amended petition. On January 8, 2015, the trial court granted Perrier a delayed appeal. See T.C.A. § 40-30-113(a)(1). On January 30, 2015, the trial court granted Perrier thirty days to file a delayed motion for new trial after finding that trial counsel was ineffective in failing to file a timely motion for new trial. See id. § 40-30-113(a)(3).

Appointed counsel filed a timely Amended and Supplemental Motion for New Trial on March 2, 2015, and a Substitute Amended and Supplemental Motion for New Trial on May 12, 2015. In the midst of these filings by counsel, the record indicates that Perrier filed a pro se Motion for Judgments of Acquittal—Or in the Alternative—Motion for New Trial.[3] On May 26, 2015, the trial court entered a third order granting Perrier a delayed appeal and a delayed motion for new trial.

---

[3] This pro se motion is included in the technical record, but no filing date is shown. The motion was signed by Perrier on May 25, 2015, and the certificate of service shows that it was delivered to the

Counsel subsequently filed a Comprehensive Supplemental Motion for New Trial, substituting this motion for all previous motions for new trial, incorporating Perrier's pro se motion, and adopting the motion for new trial filed by trial counsel prior to Perrier's first appeal. Counsel also filed a supplement to this motion.

On August 21, 2015, the trial court conducted a hearing on Perrier's delayed motions for new trial and orally denied them. Perrier filed a premature but timely notice of appeal. On November 6, 2015, the trial court entered a written order denying Perrier's motions for new trial.

## ANALYSIS

**I. Self-Defense Instruction.** Perrier argues that the trial court erroneously charged the jury on self-defense by misinterpreting the self-defense statute and by instructing the jury about various criminal offenses he was allegedly committing at the time of the shooting. He claims this error was not harmless beyond a reasonable doubt because if the court had instructed the jury as he suggests, he would have been acquitted. The State contends that the self-defense instruction was not erroneous, or, if it was erroneous, then the error was harmless. We agree that the trial court's instruction, though erroneous, was harmless.

At trial, during the Momon hearing outside the presence of the jury, the trial court informed Perrier that the State had filed a Notice of Impeachment and that if he decided to testify, he would have to answer any questions the State asked him about his prior felony conviction for theft of property, for which he received a two-year sentence. The court said it would instruct the jury that it could consider this prior conviction for the purpose of its effect, if any, on his credibility as a witness but that it could not be considered as evidence of his guilt of the charged offenses. During this hearing, Perrier asserted that he would testify at trial. Later, in the presence of the jury, Perrier testified on direct and cross-examination that he had a prior felony conviction for theft of property, for which he had received a two-year sentence. The record shows that the State never entered a certified judgment regarding the theft conviction for impeachment purposes or otherwise, even though a certified judgment was readily available because the theft conviction occurred in Shelby County Criminal Court.

Later, during a hearing outside the presence of the jury, the trial court asked counsel to review his proposed jury instruction for self-defense:

State on May 26, 2015.

-10-

I gave the new version [of the self-defense instruction;] the version that was enacted in 2007. I gave most of the options—of course, I didn't [charge] resisting arrest and all that . . . . I did include in there that . . . "It is up to the jury to decide whether or not the defendant was engaged in unlawful activity," and then I give four or five criminal offenses for them to consider. I didn't make any comments about that and I'll let them decide whether or not the proof shows he was engaged in unlawful activity. I think that's up to them to decide not me.

The trial court gave the attorneys some time to review the proposed instructions, which prompted the following exchange during a jury-out hearing:

| [The State]: | Judge, one question and it might just be my ignorance, but there's all this language about different gun laws right after the self-defense, and I didn't know if that is part of a long instruction with the employing a firearm in the commission of a felony. |
| --- | --- |
| The Court: | No. That's—the self-defense law that the legislat[ure] modified in 2007— |
| [The State]: | It's part of that language. |
| The Court: | —says—I'm trying to find it. I can't find it. They basically cr[e]ated a rule that you can't claim self-defense if you're acting illegally at the time you claim self-defense and then that presents a problem. How— is that a question for me to decide— |
| [The State]: | Right. |
| The Court: | —or is that a question for the jury to decide? Who gets to decide that question? I don't think there's any case law really on that. I err[] on [the] side of letting the jury— |
| [The State]: | So you just follow that. Okay. |
| The Court: | I[] put that in there. I'm going to let the jury decide it, but the instruction, the pattern instruction, starts off, "If a defendant was not engaged in unlawful activity," |

-11-

and so I've added there, "Whether the defendant is engaged in unlawful activity at the time he or she is claiming self-defense is a question for the jury's determination," and I tried to think of what possible unlawful activities he may or may not be engaged in at the time, and there w[ere] about eighteen to twenty, and I narrowed it down to five potential unlawful activities.

So I'll let you-all argue about whether he was engaged in unlawful activity, but I can't ask the jury to decide whether he was engaged in unlawful activity and not give them any laws. So that's why that's in there.

. . . .

[Defense Counsel]: That was just our concern too, Your Honor. The state didn't really accuse him of being engaged in any unlawful activity other than what he is on trial for, but I understand what you're saying.

The Court: Well, I mean you're the one that raised self-defense.

[Defense Counsel]: Right. I understand, Your Honor.

The Court: [With] self-defense . . . the issue arises was he engaged in unlawful activity so I—I mean if I made the call, I would say, yeah, and they shouldn't get the instruction, but I didn't think I should make that call. I should let . . . the jury[] decide[,] let you-all argue it however you want to argue it.

After this jury-out hearing, the trial court provided the following instruction for the charged offense of employment of a firearm during the attempt to commit a dangerous felony, which was consistent with Code sections 39-17-1324(b) and 39-17-1322 and the applicable pattern jury instruction:

Any person who employs a firearm during the commission [of] or attempt to commit or the flight or escape from the commission [of] or attempt to commit a dangerous offense is guilty of a crime. For you to find

-12-

the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

One, that the defendant employed a firearm.

And:

Two, that the employment was during the commission of or attempt to commit second-degree murder or voluntary manslaughter.

And:

Three, that the defendant acted either intentionally, knowingly or recklessly.

Firearm means any weapon designed, made or adapted to expel a projectile by the action of an explosive or any device readily convertible to that use.

It is a defense to prosecution for this offense if the defendant possessed, displayed or employed a handgun in justifiable self-defense or in justifiable defense of another during the commission of a crime in which the defendant or the other person defended was a victim.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.–Crim. 36.13 (14th ed. 2010).

The trial court then provided the following instruction on self-defense, which was consistent with Code section 39-11-611(b) and the applicable pattern jury instruction on self-defense:

If the defendant was not engaged in unlawful activity and was in a place where he or she had a right to be, he or she would have no duty to retreat before threatening or using force against the alleged victim when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged victim's use or attempted use of unlawful force.

If a defendant was not engaged in unlawful activity and was in a place where he or she had a right to be, he or she would also have no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury if, "A," the defendant had a reasonable belief that

there was an imminent danger or death or serious bodily injury, "B," the danger creating the belief of imminent death or serious bodily injury was real or honestly believed to be real at the time, and, "C," the belief of danger was founded upon reasonable grounds.

In determining whether the defendant's use of force in defending himself is reasonable you may consider not only his threat or use of force but also all the facts and circumstances surrounding and leading up to it.

Factors to consider in deciding whether there were reasonable grounds for the defendant to fear death or serious bodily injury from the alleged victim include, but are not limited, to any previous threats of the alleged victim made known to the defendant, the character of the alleged victim for violence when known to the defendant, the animosity of the alleged victim for the defendant . . . as revealed to the defendant by previous acts and words of the alleged victim and the manner in which the parties were armed and their relative strengths and sizes.

The use of force against the alleged victim would not have been justified if the defendant provoked the alleged victim's use or attempted use of unlawful force [u]nless the defendant abandoned the encounter or clearly communicated to the alleged victim the intent to do so and the alleged victim nevertheless continued or attempted to use unlawful force against the defendant.

This defense is not available to the defendant if the victim was an innocent third person who was recklessly injured or recklessly killed by the defendant's use of force. ["]Recklessly["] has been previously defined in these instructions.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.–Crim. 40.06(b) (14th ed. 2010).

However, at this point, the trial court deviated from the pattern jury instruction on self-defense by adding the following information to the charge:

Whether a defendant was engaged in unlawful activity at the time he or she is claiming self-defense[] is a question for the jury's determination.

A, it is a violation of federal law and unlawful for any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year to ship or transport [i]n interstate or foreign

-14-

commerce, any firearm or ammunition[;] or to possess in or affecting commerce[,] any firearm or ammunition[;] or to receive any firearm or ammunition which has been shipped or transported [in] interstate or foreign commerce.

B, it is a violation of federal law and unlawful for any person to receive or possess a firearm which is not registered to him in the [N]ational [F]irearms [R]egistration and [T]ransfer [R]ecord.

. . . .[4]

[D, i]t is a violation of state law and unlawful for a person who has been convicted of a felony to possess a handgun. In order to establish a violation of this provision the state would have to prove beyond a reasonable doubt that:

[(a)], [that] the defendant had been convicted of a felony.

[(b)], that the defendant[,] after such felony conviction[,] possessed a handgun[;]

And:

[(c)], that the defendant acted either intentionally, knowingly or recklessly.

E, it is a violation of state law for a person to unlawfully carry a weapon with intent to go armed. In order to establish a violation of this provision the state would have to prove beyond a reasonable doubt that:

[(a)], the defendant carried a firearm[;]

[(b)], the defendant did so with intent to go armed[;]

_____

[4] While instructing the jury on self-defense, the trial court realized that it had included offenses requiring previous drug convictions that were not relevant to Perrier's case. Following a short bench conference on this issue, the court informed the jury of these mistakes, made corrections to the official copy of the jury instructions that was filed as an exhibit, and instructed the jury to make identical corrections on their own copies of the instructions. These corrections resulted in the offense in section C being deleted entirely. The copy of the jury instructions filed as an exhibit in the original appellate record contains the corrections indicated by the trial court in the jury instructions transcript. To clarify the charge provided to the jury, we, like the State, have chosen to omit the bench conference discussion and the trial court's explanations to the jury about these corrections.

-15-

And:

[(c)], that the defendant acted intentionally, knowingly or recklessly.

. . . .

[A] person who has been convicted of a felony offense is ineligible to obtain a handgun carry permit[.]

The trial court then included the definitions in the self-defense pattern jury instruction for the terms of "Force," "Imminent," "Serious bodily injury," and "Bodily injury" as well as the following language regarding the State's burden of proof and reasonable doubt, which was also consistent with the pattern jury instruction:

If evidence is introduced supporting self-defense, the burden is on the state to prove beyond a reasonable doubt that the defendant did not act in self-defense. If from all the facts and circumstances you find the defendant acted in self-defense or if you have a reasonable doubt as to whether the defendant acted in self-defense, you must find him not guilty.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.–Crim. 40.06(b) (14th ed. 2010).

Perrier asserts that the trial court erroneously charged the jury on self-defense by misinterpreting the self-defense statute and by instructing the jury on the various criminal offenses he was allegedly committing at the time of the shooting. He suggests that the "not engaged in unlawful activity" portion of the self-defense instruction should only be given when "the defendant's unlawful activity could reasonably be viewed as having caused the defendant to have to defend himself." Pursuant to this interpretation, Perrier argues that if a defendant robs a victim and the victim fights back, the defendant could not claim self-defense; however, if a defendant walks down a sidewalk with a marijuana cigarette in his pocket and the victim suddenly attacks him without being provoked by the defendant, the possession of the marijuana cigarette would not preclude the defendant from claiming self-defense because the possession of the marijuana did not cause the defendant to defend himself. Perrier asserts that when, as in his case, "it is clear that the defendant's unlawful act is not what caused the defendant to have to defend himself, the trial court should not even mention the 'unlawful activity' part of the self-defense instruction to the jury." However, he claims that in a scenario like the robbery above, in which the defendant's unlawful act "could reasonably be viewed as having caused the defendant to have to defend himself," the trial court would instruct the jury on the "unlawful activity" portion of the self-defense instruction and then allow the jury to

-16-

decide "(1) whether the defendant was engaged in an unlawful activity and (2) whether the defendant's unlawful activity caused the defendant to have to defend himself."

In considering whether this instruction was erroneous, we note that a defendant in a criminal case has a constitutional right to a correct and complete charge of the law, so that each issue of fact raised by the proof will be submitted to the jury on proper instructions. State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011) (citing State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005); State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001); State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000)). It follows then that trial courts have a duty in criminal cases to instruct the jury on the law applicable to the facts of a case. State v. Clark, 452 S.W.3d 268, 294-95 (Tenn. 2014) (citing State v. Thompson, 285 S.W.3d 840, 842 n.1 (Tenn. 2009); State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999)). An erroneous or inaccurate jury charge, rather than an omitted jury charge, may be raised for the first time in a motion for new trial. State v. Lynn, 924 S.W.2d 892, 898-99 (Tenn. 1996) (citing Tenn. R. Crim. P. 30(b)). Whether jury instructions are sufficient is a question of law that this court reviews de novo with no presumption of correctness. Clark, 452 S.W.3d at 295 (citing State v. Hawkins, 406 S.W.3d 121, 128 (Tenn. 2013); Nye v. Bayer Cropscience, Inc., 347 S.W.3d 686, 699 (Tenn. 2011)).

When reviewing challenged jury instructions, this court must "view the instruction in the context of the charge as a whole" in determining whether prejudicial error has occurred. Id. (citing State v. Rimmer, 250 S.W.3d 12, 31 (Tenn. 2008); State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997)). An instruction is prejudicially erroneous and requires reversal when "the instruction alone infected the entire trial and resulted in a conviction that violates due process," see State v. James, 315 S.W.3d 440, 446 (Tenn. 2010), or "when the judge's charge, taken as a whole, failed to fairly submit the legal issues or misled the jury as to the applicable law," see State v. Majors, 318 S.W.3d 850, 864-65 (Tenn. 2010). Id.

In resolving Perrier's challenges to this self-defense instruction, we find State v. Anthony Henvey, No. W2013-00654-CCA-R3-CD, 2014 WL 2566487 (Tenn. Crim. App. June 5, 2014), perm. app. denied (Tenn. Sept. 18, 2014), instructive. Henvey, who had been convicted of attempted second degree murder and possession of a weapon during the attempt to commit a dangerous felony, argued that the trial judge, who was the same judge who presided over Perrier's case, erroneously instructed the jury on self-defense. Id. at *1. The morning of trial, the State informed the trial court that Henvey had a prior robbery conviction in California, for which he served eight months on a three-year sentence, and asserted that if Henvey claimed self-defense, it would inquire about the robbery conviction because Henvey was unlawfully possessing a handgun as a felon, and therefore, the State argued, was engaged in unlawful activity at the time he used

deadly force.  Id. at *9.  The trial court agreed that the prior conviction would be relevant if Henvey claimed self-defense.  Id.  During this pre-trial hearing, Henvey denied that he had been convicted of a felony, and the State acknowledged that they had not yet obtained a certified judgment for this conviction, though the conviction had been confirmed by the National Crime Information Center (NCIC) report.  Id.  Henvey's attorney declined to stipulate to any prior felony conviction because his client was "not certain," and the trial court ruled that the State could ask Henvey at trial if he had ever been convicted in California of robbery or attempted robbery but that it would be "stuck" with Henvey's answer.  Id. at *9-10.  Because the State was concerned that Henvey would give an ambiguous or negative answer in response to its questioning, the trial court recessed the trial until the next day to give the State time to obtain the certified judgment of the California conviction.  Id.  During cross-examination, Henvey admitted that he had been charged with robbery in California and that he had been convicted of robbery or attempted robbery.  Id.  In a jury-out hearing following the conclusion of proof, defense counsel argued that the trial court was precluded from mentioning the felony conviction in the self-defense instruction because, in the absence of a certified judgment, the State failed to prove that Henvey was a felon.  Id. at *11.  The trial court held that it was going to let the jury decide whether Henvey was engaged in unlawful activity at the time he allegedly acted in self-defense and that the attorneys could argue whether Henvey was unlawfully possessing a handgun as a felon at the time he shot the victim.  Id.  The court explained:

> Of course then, the question is, who should decide if he is not engaged in unlawful activity, me or the jury and I am thinking that the jury needs to make that call and not me.
>
> And how do they decide whether he is engaged in unlawful activity without defining some crimes that might be.  I don't want to comment on the evidence, but on the other hand, they've got to have the statutes in front of them to know whether he is acting unlawfully.

Id.  The trial court then instructed the jury in accordance with the pattern jury instruction for self-defense before providing an additional instruction, charging several federal and state offenses involving firearms, that was similar to the instruction in Perrier's case except that it also charged the jury on the offense of robbery under California law.  Id. at *12.

In evaluating whether the self-defense instruction in Henvey was erroneous, this court held:

-18-

The obvious and simple remedy for the trial court's concern [that the State had failed to prove Henvey had been convicted of a felony] would have been for the court to have ordered a brief recess, as the court had said it would, so that the State could obtain a certified copy of the judgment. Instead, the trial court decided to let the jurors determine whether the appellant had been convicted of a felony by instructing them on portions of federal law, California law, and Tennessee law, much of which the jury had no way of determining was factually relevant to the appellant's prior conviction. In short, we are puzzled as to how the trial court could expect twelve jurors, presumably lay persons unversed in the law, to determine from the lengthy and somewhat convoluted instruction whether the appellant had been convicted of a prior felony in California and, therefore, was a felon in possession of a weapon on May 28, 2011. Thus, we agree with the appellant that the trial court's instruction to the jury was error.

Id. at *13 (footnote omitted). However, this court concluded that the error was harmless:

The State argues that the trial court's error was harmless because the appellant was engaged in unlawful activity at the time of the shooting. Indeed, the appellant does not dispute that the crime was a felony or that he was a felon in possession of a handgun when he shot the victim. The record reflects that the State introduced a certified copy of the California conviction at the sentencing hearing. The certified copy confirms that the appellant was convicted in 1993 of second degree attempted robbery and received a three-year sentence. "To prevail on the theory of self-defense, a defendant must show that he or she was 'not engaged in unlawful activity' and was 'in a place where the person has a right to be.'" State v. Hawkins, 406 S.W.3d 121, 128 (Tenn. 2013) (citing Tenn. Code Ann. § 39-11-611(b)(1) (2010)). Therefore, we agree with the State that the trial court's erroneous instruction did not affect the outcome of the trial.

Id. at *14.

The State asserts that unlike in Henvey, the trial court in Perrier's case instructed the jury on state and federal law regarding the unlawful possession of a gun by a felon but did not ask the jury to determine whether the defendant had been convicted of a prior felony. It claims that because the self-defense instruction was not as lengthy or convoluted as the instruction in Henvey and did not concern an issue that "the jury had no way of determining was factually relevant to" his prior conviction, the instruction in Perrier's case was not erroneous. See id. at *13. Alternatively, the State argues that even if the instruction in Perrier's case was error, as it was in the Henvey case, it was harmless

-19-

because Perrier admitted that he was a convicted felon at trial and has never disputed this fact on appeal. The State asserts that because Perrier was clearly engaged in unlawful activity at the time he fired the shots, the trial court's instruction had no effect on the outcome of trial. The State also claims that Perrier's conviction for employing a firearm during the attempt to commit a dangerous felony, as charged in Count 2, made the trial court's instruction harmless beyond a reasonable doubt because the jury rejected Perrier's theory that he was acting in justifiable self-defense, regardless of the trial court's later instructions as to the state and federal laws Perrier may have committed at the time of the shooting.

In challenging the self-defense instruction, Perrier concedes that this court has held that a trial court can decline to give the self-defense instruction if it finds that the defendant was engaged in an unlawful activity at the time he claims self-defense. See State v. Victor Dyson, No. W2014-01818-CCA-R3-CD, 2015 WL 9466679, at *4 (Tenn. Crim. App. Dec. 28, 2015) (stating that "the question of whether the Defendant-Appellant was engaged in unlawful activity within the meaning of the self-defense statute was properly within the province of the trial court"); State v. Nico Farmer, No. W2013-02736-CCA-R3-CD, 2015 WL 314704, at *7 (Tenn. Crim. App. Jan. 23, 2015) (holding that self-defense was not raised by the proof when the evidence showed that the unarmed victim was shot while the defendant tried to rob him); Jason Osmond Hines v. State, No. E2013-01870-CCA-R3-PC, 2014 WL 1576972, at *11 (Tenn. Crim. App. Apr. 21, 2014) (concluding that the petitioner failed to establish any prejudice from counsel's failure to request a self-defense instruction because the petitioner was engaged in illegal activity, a drug deal, at the time of the shooting), perm. app. denied (Tenn. Sept 18, 2014); State v. Zachary Carlisle, No. W2012-00291-CCA-MR3-CD, 2013 WL 5561480, at *19 (Tenn. Crim. App. Oct. 7, 2013) (holding that the failure to give the self-defense instruction was not error because the evidence, even in the light most favorable to the defendant, showed that the defendant was engaged in the unlawful activity of a drug deal or robbery at the time he shot the victim and there was no evidence suggesting that the victim threatened the defendant), perm. app. denied (Tenn. Mar. 17, 2014). However, Perrier claims these cases were wrongly decided because they allow a trial court to deny a self-defense instruction if it finds that the defendant was engaged in unlawful activity at the time he claims self-defense.

We conclude that when the issue of self-defense is fairly raised by the evidence, a trial court should not deny a defendant an instruction on self-defense solely on the basis that the defendant was engaged in unlawful activity. In reaching this conclusion, we recognize that the trial court makes the determination as to whether evidence fairly raising self-defense has been introduced. Hawkins, 406 S.W.3d at 129 (citing T.C.A. § 39-11-203(c)). "The quantum of proof necessary to fairly raise a general defense [like that of self-defense] is less than that required to establish a proposition by a

preponderance of the evidence." Id. In determining whether self-defense has been fairly raised by the evidence, the court must examine the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor. Id. If admissible evidence fairly raises the issue of self-defense, then the trial court is required to submit the issue of self-defense to the jury. Id.; see T.C.A. § 39-11-203(c) ("The issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof."). Then the burden shifts to the State to prove beyond a reasonable doubt that self-defense does not apply. Id.; Hawkins, 406 S.W.3d at 129. At that point, any issue as to whether a defendant is acting in self-defense, including the issue of whether the defendant was engaged in unlawful activity at the time he used deadly force, is a question for the jury. State v. Echols, 382 S.W.3d 266, 283 (Tenn. 2012) ("Self-defense is a question of fact for the jury."); State v. Deanty Montgomery, No. E2014-01014-CCA-R3-CD, 2015 WL 3409485, at *8 (Tenn. Crim. App. May 28, 2015) ("[T]he question of whether the Defendant's actions were unlawful at the time of the shooting was a question for the jury in their role as fact-finders."), perm. app. denied (Tenn. Oct. 15, 2015); Cf. State v. Tracey C. Clark, No. M2007-00496-CCA-R3-CD, 2008 WL 1699425, at *5 (Tenn. Crim. App. April 10, 2008) (concluding that the trial court usurped the role of the jury as fact-finder when it dismissed the indictment for possession of a weapon on school grounds after finding that the defendant acted in justifiable self-defense pursuant to Code section 39-17-1322), perm. app. dismissed (Tenn. June 17, 2008). Whether the defendant was engaged in unlawful activity for the purposes of the self-defense statute necessarily bears on a defendant's guilt or innocence, and as such, should be determined by the jury. Cf. Tracey C. Clark, 2008 WL 1699425, at *5 (concluding that the facts showing that the defendant acted in self-defense pursuant to Code section 39-17-1322 were so intertwined with the issue of the defendant's guilt or innocence that the issue of justifiable self-defense had to be decided by the jury). In reaching this conclusion, we note that a trial court's determination as to whether self-defense is raised by the evidence is an entirely different inquiry than a jury's determination of whether the defendant was engaged in unlawful activity for the purposes of the self-defense statute.

Perrier also argues that the trial court should not have instructed the jury on the "unlawful activity" portion of the self-defense instruction. He claims, without citation to supporting authority, that when it is clear that the defendant's unlawful act is not what prompted the defendant to defend himself, the trial court should not mention the 'unlawful activity' part of the self-defense instruction. However, this proposition is simply not consistent with the language of the self-defense statute or the accompanying pattern jury instruction. As we have noted, much of the trial court's instruction followed the pattern jury instruction for self-defense. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.–Crim. 40.06(b) (14th ed. 2010). This court has consistently approved the statement of law in the pattern jury instruction for self-defense. See, e.g., Deanty Montgomery, 2015 WL 3409485, at *10 ("The trial court's instruction on self-defense was a proper

statement of the law. The instruction tracks the language of the relevant statute, <u>see</u> Tennessee Code Annotated section 39-11-611(b), and it follows the pattern jury instruction, as provided in the Tennessee Pattern Jury Instructions."); <u>State v. Jamaal L. Byrd</u>, No. E2013-00365-CCA-R3-CD, 2014 WL 545451, at *5 (Tenn. Crim. App. Feb. 10, 2014) ("Finally, and perhaps most importantly, the self-defense instruction provided by the trial court tracked the language of the pattern jury instruction and was a correct statement of the law."), <u>perm. app. denied</u> (Tenn. Aug. 26, 2014); <u>State v. April Jenkins</u>, No. E2007-02519-CCA-R3-CD, 2009 WL 137208, at *5 (Tenn. Crim. App. Jan. 21, 2009) (concluding that the self-defense instruction contained a fair and accurate statement of the law because it "tracked, almost word for word, the language of the pattern jury instruction applicable at the time of the offense"), <u>perm. app. denied</u> (Tenn. June 22, 2009). Therefore, we conclude that the portion of the instruction that was in accordance with the pattern jury instruction for self-defense fairly submitted the legal issues and contained a proper statement of the applicable law.

We will now consider whether the remainder of the instruction, which was not in accordance with the pattern jury instruction, was erroneous. As applicable to this case, the self-defense statute provides in pertinent part:

> Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
> (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(2) (Supp. 2009). This statute requires that a defendant not be "engaged in unlawful activity" before using force that is intended or likely to cause death or serious bodily injury. <u>See id.</u> "To prevail on the theory of self-defense, a defendant must show that he or she was not engaged in unlawful activity and was in a place where the person has a right to be." <u>Hawkins</u>, 406 S.W.3d at 128 (internal quotation marks and citation omitted).

In this case, the trial court stated that if it was charged with determining whether Perrier was engaged in unlawful activity, it would not provide the self-defense instruction because Perrier was committing several criminal offenses at the time he fired the shots in this case. However, in the interest of fairness to the defense, the trial court allowed the jury to decide whether Perrier was engaged in unlawful activity at the time he used the

-22-

deadly force. It then instructed the jurors on the federal offenses making it unlawful for a person who has been convicted of a crime punishable for a term exceeding one year to possess any firearm or ammunition pursuant to 18 U.S.C.A. § 922(g) and making it unlawful for a person to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record pursuant to 26 U.S.C.A. § 5861. The trial court also instructed the jury on the state offenses involving the unlawful possession of a handgun by a convicted felon pursuant to Code section 39-17-1307(c), a Class E felony; the carrying a firearm with the intent to go armed pursuant to Code section 39-17-1307(a), a misdemeanor; and the ineligibility of convicted felons to obtain a handgun carry permit pursuant to Code section 39-17-1351(c)(6). Unfortunately, the result was a long and complicated instruction like that in Henvey that required the jury to determine if Perrier had committed any of the aforementioned federal or state offenses and, therefore, was engaged in unlawful activity at the time he used deadly force.

We must note that although it has not yet done so, the General Assembly has the authority to specify any criminal offenses that would constitute unlawful activity for the purposes of the self-defense statute, just as it has done in similar circumstances. Cf. T.C.A. § 39-17-1324(i)(1) (identifying the offenses that constitute the predicate dangerous felony for possession or employment of a firearm offenses); § 39-13-202(a)(2) (specifying the underlying felonies for felony murder); § 40-35-501(i)(1), (2) (requiring that the sentences for certain serious offenses be served at one hundred percent). Should it choose to do so, the General Assembly could determine whether misdemeanors, outstanding warrants, and other less serious criminal offenses would constitute the type of unlawful activity envisioned by the self-defense statute. It could also require a causal relationship between the "unlawful activity" and the use of deadly force before a defendant is precluded from claiming self-defense.

As the law currently stands, we believe it was error for the trial court, as a part of the self-defense instruction, to charge the jury on any offenses that were not charged in the indictment. The information regarding the uncharged federal and state offenses was confusing and had the effect of a trial within a trial because the jury had to determine whether Perrier was committing any of the several uncharged offenses, and was therefore engaged in unlawful activity, at the time that he used deadly force. Obviously, this holding emphasizes the need for the State to charge the defendant with all possible crimes he was committing at the time he used force, even to the point of obtaining a superseding indictment, so that the jury will receive instructions for these offenses before determining whether the defendant was engaged in unlawful activity. Although we do not believe that a trial court should instruct the jury on uncharged offenses as a part of the self-defense instruction, our holding does not prevent the State from offering any proof of facts and circumstances surrounding and leading up to the defendant's conduct to show that a defendant was engaged in unlawful activity at the time he used force. See State v. Ivy,

868 S.W.2d 724, 727 (Tenn. Crim. App. 1993) ("Reliance on self-defense is not limited to the exact moment of the assault" and may require consideration of "the entirety of the events leading to the assault."); Deanty Montgomery, 2015 WL 3409485, at *8 ("[T]he jury was entitled to consider all of the facts and circumstances leading up to the Defendant's conduct in determining whether the Defendant's use of force in defending himself was reasonable, including whether he was engaged in 'unlawful activity' at the time."); See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.–Crim. 40.06(b) (14th ed. 2010) ("In determining whether the defendant's use of force in defending himself is reasonable you may consider not only his threat or use of force but also all the facts and circumstances surrounding and leading up to it.").

In light of our holding, the trial court in Perrier's case should not have instructed the jury on any uncharged offenses, including the uncharged weapons offenses found in part 13 of Tennessee Code Annotated title 39, chapter 17, see T.C.A. §§ 39-17-1301 to -1364. However, in cases in which a handgun offense in part 13 is charged, the trial court should give the pattern jury instructions for these offenses that include the following language referencing Code section 39-17-1322: "It is a defense to prosecution for this offense that the defendant possessed, displayed or employed a handgun in justifiable self-defense or in justifiable defense of another during the commission of a crime in which the defendant or the other person defended was a victim." See Tracey C. Clark, 2008 WL 1699425, at *6 (Woodall, J., concurring) ("By its explicit terms, the statutory defense [in Code section 39-17-1322] relied upon by Appellee applies only to handguns, and not rifles, not shotguns, and certainly not knives, knuckles, or "hoax devices[,]" which arguably means that "a person who possesses in his vehicle parked at a school a shotgun, . . . while that person is attending a function at the school, could not avail himself of the defense set forth in Section 39-17-1322, if he is charged, as was Appellee, with violation of Code section 39-17-1309(b)(1), no matter what grave circumstances the person found himself to be involved in."); see, e.g., 7 Tenn. Prac. Pattern Jury Instr. T.P.I.–Crim. 36.05(b), 36.13 (14th ed. 2010). This portion of the pattern jury instruction allows the jury to determine whether the defendant committed a handgun offense in part 13 in justifiable self-defense. If the jury finds that the defendant did not commit the handgun offense in justifiable self-defense, then it would next determine whether the commission of the handgun offense established that the defendant was engaged in unlawful conduct at the time he used force or deadly force for the purposes of the self-defense statute in Code section 39-11-611.

Because we have determined that the trial court's instruction was error, we must now consider whether this error was harmless or prejudicial. Errors in jury instructions are typically subject to a "harmless error" analysis. Hawkins, 406 S.W.3d at 128 (citing State v. Williams, 977 S.W.2d 101, 104-05 (Tenn. 1998)). The test in determining whether an instructional error is harmless is "'whether it appears beyond a reasonable

doubt that the error complained of did not contribute to the verdict obtained.'" State v. Cecil, 409 S.W.3d 599, 610 (Tenn. 2013) (quoting State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008)).

We agree with the State that in light of the jury's decision to convict Perrier of employing a firearm during the attempt to commit a dangerous felony, the trial court's self-defense instruction, though error, was harmless. The trial court in Perrier's case properly instructed the jury that justifiable self-defense is a defense to the employment of a firearm charge. When the jury found Perrier guilty of the employment of a firearm offense, it rejected Perrier's theory that he acted in justifiable self-defense when he committed the firearm offense. It also simultaneously found that Perrier was engaged in unlawful activity at the time he used deadly force, regardless of the trial court's instructions as to the other uncharged state and federal offenses Perrier may have been committing. As we noted, "[t]o prevail on the theory of self-defense, a defendant must show that he or she was 'not engaged in unlawful activity' and was 'in a place where the person has a right to be.'" Hawkins, 406 S.W.3d at 128 (citing T.C.A. § 39-11-611(b)(1) (2010)). The jury was able to consider all of the facts and circumstances surrounding and leading up to Perrier's conduct in determining whether he was engaged in unlawful activity at the time he used deadly force. See Deanty Montgomery, 2015 WL 3409485, at *8. Although the trial court erroneously provided instructions to the jury on uncharged offenses, the jury, by its verdict, found that Perrier was engaged in unlawful activity, namely the employment of a firearm, at the moment he fired the shots. Because the trial court's erroneous self-defense instruction did not affect the outcome of Perrier's trial, it was harmless.

As a secondary argument, Perrier claims, citing Code sections 39-17-1322 and 39-11-611, that "it would make no sense for the Legislature to allow a defendant to rely on self-defense to defeat a weapons charge under [Code] section 39-17-1322, but then take self-defense away from that same defendant in a murder case in which he was unlawfully possessing a weapon at the time he acted in self-defense." He argues that this contention is supported by this court's recent decision in State v. Deanty Montgomery, 2015 WL 3409485, at *1.

In Deanty Montgomery, a jury found Montgomery guilty of misdemeanor reckless endangerment as a lesser included offense of attempted first degree murder, unlawful possession of a weapon, and aggravated assault. Id. at *4. Montgomery asserted that the trial court erred in allowing the State to offer proof and argue that he was engaged in unlawful activity and, therefore, had a duty to retreat before resorting to deadly force in self-defense. Id. at *5. Specifically, he claimed that Code section 39-17-1322 barred his prosecution for unlawful possession of a weapon because he employed the handgun in justifiable self-defense and that his drug deal was not "ongoing" in nature because it was

-25-

completed two days prior to his use of force in self-defense.  Id.  In determining whether the trial court erred, this court held:

> [W]e agree that section 39[-]17-1322 does not bar a charge or conviction for the Defendant's conduct in this case, and any issue in that regard, i.e., whether he was acting in justifiable self-defense, was a proper question for the jury.  However, the issue of whether one was engaged in justifiable self-defense while unlawfully possessing a weapon does not equate to the issue of whether one was engaged in "unlawful activity" for the purposes of the self-defense statute requiring a duty to retreat.  If we were to permit the State to argue that a felon in possession of a weapon asserting self-defense, without more, could satisfy the definition of "unlawful activity," such an interpretation would nullify the defense set forth in section 39-17-1322, leading to an absurd result.  Accordingly, the State should not have been permitted to argue that the Defendant's conduct, a convicted felon for a drug offense arming himself with a weapon prior to the shooting, standing alone, could have formed the basis for the jury to conclude that the Defendant was engaged in "unlawful activity" for the purposes of the self-defense statute requiring a duty to retreat.
>
> . . . We note that the parties seemingly argue both of these theories, unlawful possession of a weapon and selling drugs, in a vacuum as to whether they qualify as "unlawful activity" for purposes of the self-defense statue.  However, we feel constrained to note that the jury was entitled to consider all of the facts and circumstances leading up to the Defendant's conduct in determining whether the Defendant's use of force in defending himself was reasonable, including whether he was engaged in "unlawful activity" at the time.  See T.P.I. Crim.—40.06(b)(2).
>
> Although we conclude that the trial court erred in allowing the State's argument [that] unlawful possession of a weapon alone satisfied the definition of "unlawful activity," the jury in this case was charged that justifiable self-defense was a defense to the possession charge.  Moreover, the jury was properly allowed to consider all of the Defendant's conduct leading up to the shooting in determining whether he was engaged in "unlawful activity" and, therefore, had a duty to retreat under section 39-11-611(b).  Indeed, the question of whether the Defendant's actions were unlawful at the time of the shooting was a question for the jury in their role as fact-finders.  Given the overwhelming evidence that the Defendant was engaged in "unlawful activity" at the time of the offenses, i.e., dealing drugs and all of his attendant conduct surrounding that transaction, and in

-26-

light of the jury's decision to find the Defendant guilty of unlawful possession of a weapon with proper instructions, any error in permitting the State's argument was certainly harmless. The Defendant is not entitled to relief.

Id. at *7-8.

Despite Perrier's assertion, the code does not allow a defendant to rely on self-defense to defeat a weapons charge pursuant to Code section 39-17-1322 but prevent a defendant from relying on self-defense in a murder case in which the defendant unlawfully possessed a weapon. The defenses in Code sections 39-17-1322 and 39-11-611 can operate independently or in tandem depending on the charges, the facts, and the defense's theory in each specific case. Because Perrier's case involved both the defense in Code section 39-17-1322 and the defense in Code section 39-11-611, it was the jury's duty to determine if these defenses applied. When the trial court charged the jury as to the employment of a firearm offense, it included the language from the pattern jury instruction referencing Code section 39-17-1322, which states, "It is a defense to prosecution for this offense that the defendant possessed, displayed or employed a handgun in justifiable self-defense or in justifiable defense of another during the commission of a crime in which the defendant or the other person defended was a victim." If the jury had found that Perrier employed the handgun in justifiable self-defense, then it would have acquitted him of the employment of a firearm charge pursuant to Code section 39-17-1322, and the jury would have been unable to rely on Perrier's commission of the employment of a firearm offense in determining whether he was engaged in unlawful activity for the purposes of Code section 39-11-611. Conversely, because the jury found that Perrier did not employ the handgun in justifiable self-defense pursuant to Code section 39-17-1322, it was able to consider Perrier's commission of the employment of a firearm offense in determining whether he was engaged in unlawful activity pursuant to the self-defense statute in Code section 39-11-611. Though Perrier suggests otherwise, the defeat of a weapons charge pursuant to Code section 39-17-1322 simply means that the jury cannot consider the conduct that was the subject of the weapons charge in determining whether a defendant was engaged in unlawful activity for the purposes of Code section 39-11-611.

**II. Failure to Instruct on Lesser Included Offense.** Perrier argues that the trial court committed plain error in failing to instruct on possession of a firearm during the attempt to commit a dangerous felony as a lesser included offense of employment of a firearm during the attempt to commit a dangerous felony. The State responds that Perrier never requested this instruction at trial and has not shown plain error. We agree with the State that the trial court's failure to instruct on this lesser included offense was not plain error.

-27-

Perrier concedes that he waived this issue because his attorney never made a written request for the trial court to instruct the jury regarding possession of a firearm as a lesser included offense of employment of a firearm. Tennessee Code Annotated section 40-18-110(c) provides:

> Notwithstanding any other provision of law to the contrary, when the defendant fails to request the instruction of a lesser included offense as required by this section, the lesser included offense instruction is waived. Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal.

T.C.A. § 40-18-110(c) (Supp. 2009). However, as Perrier notes, the waiver of a lesser included offense instruction does not prevent this court from considering the issue under the doctrine of plain error. State v. Fayne, 451 S.W.3d 362, 371 (Tenn. 2014) (citing State v. Page, 184 S.W.3d 223, 230 (Tenn. 2006); State v. Vasques, 221 S.W.3d 514, 524 (Tenn. 2007)).

The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error, (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "'necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Id. at 283.

As support for his claim, Perrier relies on Fayne, 451 S.W.3d at 370, wherein the Tennessee Supreme Court held that possession of a firearm during the commission of a dangerous felony is a lesser included offense of employment of a firearm during the commission of a dangerous felony. However, he acknowledges that the court in Fayne held that the defendant had not established plain error because he failed to show the breach of a clear and unequivocal rule of law. Specifically, the court stated:

> While a defendant is entitled to a correct and complete charge of the law, [Page, 184 S.W.3d at 229], this Court has previously held that the omission

-28-

of an instruction on a lesser included offense does not result in the breach of a clear and unequivocal rule of law when the status of the crime as a lesser included offense is not apparent based on prior law, see State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003) (holding that the trial court did not commit plain error when it was not previously clear "whether attempted aggravated criminal trespass was a lesser-included offense of attempted aggravated burglary"). In this instance, possession of a firearm during the commission of a dangerous felony has not previously been recognized as a lesser included offense of employment of a firearm during the commission of a dangerous felony. Moreover, while our application of Tennessee Code Annotated section 40-18-110(f)(1) establishes that possession of a firearm qualifies as a lesser included offense, that conclusion was not so readily apparent based on prior case law as to give rise to a clear and unequivocal rule of law. As a result, the omission of an instruction on possession of a firearm did not amount to the breach of a clear and unequivocal rule of law and does not support a finding of plain error.

Id. at 372 (footnote omitted).

Similar to Fayne, at the time of Perrier's trial, possession of a firearm during the attempt to commit a dangerous felony had not been recognized as a lesser included offense of employment of a firearm during the attempt to commit a dangerous felony. The Tennessee Supreme Court did not make the pronouncement in Fayne until several months after Perrier filed his pro se post-conviction petition in this case. Id. at 370.

Perrier, in an attempt to establish that the failure to provide the lesser included offense instruction amounted to plain error, cites to footnote six of the Fayne opinion, which states:

In Terry, this Court focused on whether the lesser included offense had been recognized as such "at the time of trial." [118 S.W.3d] at 360. Later, the United States Supreme Court, construing the federal plain error rule, Fed. R. Crim. P. 52(b), held that plain error may be established when a trial court rules on an unsettled question of law and an intervening decision by a different court settles the question prior to appeal. Henderson v. United States, ___ U.S. ____, 133 S. Ct. 1121, 1129-30, 185 L. Ed. 2d 85 (2013). In this instance, the parties have not briefed or relied upon Henderson. Accordingly, we leave for a future case the question of whether the ruling in Henderson applies under Tennessee law.

Id. at 372 n.6.

Perrier, like other defendants before him, "views this footnote as an invitation to litigate the applicability of Henderson to Tennessee Rule of Appellate Procedure 36(b)." See State v. Rhakim Martin, No. W2013-02013-CCA-R3-CD, 2015 WL 555470, at *14 (Tenn. Crim. App. Feb. 10, 2015), perm. app. granted (Tenn. May 15, 2015).[5] However, until the Tennessee Supreme Court rules otherwise, we are bound to follow the well-established precedent in Fayne and Terry, which held that "the omission of an instruction on a lesser included offense does not result in the breach of a clear and unequivocal rule of law when the status of the crime as a lesser included offense is not apparent based on prior law." Fayne, 451 S.W.3d at 372 (citing Terry, 118 S.W.3d at 360). In reaching this decision, we reiterate that Henderson involved the construction of the federal plain error rule, which is not the rule at issue in this case. See Rhakim Martin, 2015 WL 555470, at *14. Therefore, based on current law, Perrier has failed to establish that the trial court committed plain error when it failed to instruct on the lesser included offense of possession of a firearm during the attempt to commit a dangerous felony.

Lastly, we must recognize that the uncontroverted evidence at trial established that Perrier employed the firearm, rather than merely possessed it, during the attempt to commit the dangerous felony and that Perrier's theory at trial was that he fired his gun in self-defense. Based on the evidence presented at trial and the defense's theory of the case, we conclude that no rational jury would have convicted Perrier of possession of a firearm rather than employment of a firearm. See State v. Moore, 485 S.W.3d 411, 421-22 (Tenn. 2016) (holding that under the harmless error analysis of State v. Allen, 69 S.W.3d 181, 191 (Tenn. 2002), this court should thoroughly examine the record, including the proof presented at trial, the defendant's theory of defense, and the jury's verdict; moreover, in examining the evidence presented at trial, this court should "focus[] on the distinguishing element between the greater and lesser offenses, the strength of the evidence of the distinguishing element, and the existence of contradicting evidence of the distinguishing element" in determining whether the jury would have convicted the defendant of the lesser included offense rather than the charged offense); State v. Banks, 271 S.W.3d 90, 126 (Tenn. 2008) (concluding that "[i]f no reasonable jury would have convicted the defendant of the uncharged lesser-included offense rather than the offense for which the defendant was convicted, then the failure to charge is harmless beyond a reasonable doubt."). Because the trial court's error in failing to charge the lesser included offense was harmless beyond a reasonable doubt, Perrier has also failed to show that a substantial right of his was adversely affected or that consideration of the error is

_____

[5] The Tennessee Supreme Court granted the defendant's application for permission to appeal, expressing interest in the following two issues: (1) whether the trial court's failure to instruct the jury on possession of a firearm during the commission of a dangerous felony as a lesser included offense of employment of a firearm during the commission of a dangerous felony constitutes plain error; and (2) whether the failure to name the predicate felony of the firearm offense voids Count Two of the indictment. See State v. Rhakim Martin, No. W2013-02013-SC-R11-CD (Tenn. May 15, 2015) (order).

"necessary to do substantial justice." Consequently, Perrier is not entitled to plain error relief.

**III. Failure to Name the Underlying Felony of the Firearm Offense.** Perrier contends that Count 2, charging him with employment of a firearm during the attempt to commit a dangerous felony, is void because it failed to name the underlying predicate felony. Despite well-established case law to the contrary, Perrier asserts that a firearm count that does not identify the underlying dangerous felony must, within its four corners, expressly incorporate the count charging the underlying dangerous felony. Alternatively, he claims that Count 2 is void because it is not listed on the same page as Count 1 of the indictment, because it does not name a victim, and because the underlying dangerous felony was an essential element of the firearm offense. The State counters that Perrier had adequate notice that the predicate felony was attempted second degree murder because it was the only "dangerous felony" charged in the indictment. We agree with the State.

As applicable to this case, Code section 39-17-1324 states that "[i]t is an offense to employ a firearm during the . . . [a]ttempt to commit a dangerous felony[.]" T.C.A. § 39-17-1324(b)(2) (Supp. 2009). The statute then specifies a list of predicate offenses that constitute dangerous felonies. See id. § 39-17-1324(i)(1). The Code section also states that an offense under this statute "shall be pled in a separate count of the indictment or presentment and tried before the same jury and at the same time as the dangerous felony." Id. § 39-17-1324(d). Notably, the statute does not require that the predicate underlying felony be named in the count of the indictment charging a violation of Code section 39-17-1324.

Initially, we recognize that Perrier first raised the issue regarding the insufficiency of Count 2 of the indictment in his delayed motion for new trial. However, Perrier was under no obligation to raise this issue before trial pursuant to Tennessee Rule of Criminal Procedure 12(b). See Tenn. R. Crim. P. 12(b) (stating that motions alleging a defect in the indictment must be made prior to trial unless the indictment "fails to show jurisdiction in the court or to charge an offense."); State v. Demeko Gerard Duckworth, No. M2012-01234-CCA-R3-CD, 2013 WL 1933085, at *19 (Tenn. Crim. App. May 10, 2013) (stating that "because the defendant's claim is that the indictment for employing a firearm during the commission of a felony failed to charge that offense [given the State's failure to allege a predicate felony], it is not barred by Tennessee Rule of Criminal Procedure 12"), perm. app. denied (Tenn. Oct. 17, 2013).

The United States Constitution and the Tennessee Constitution state that a defendant is entitled to knowledge of "the nature and cause of the accusation." U.S. Const. amend. VI; Tennessee Const. art. I, § 9. The Tennessee Supreme Court has stated

that an indictment is valid if it contains sufficient information (1) to enable the defendant to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the defendant against double jeopardy. State v. Hammonds, 30 S.W.3d 294, 302 (Tenn. 2000) (citing State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997)). In addition, pursuant to Tennessee Code Annotated section 40-13-202, the indictment must

> state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner so as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment. . . .

T.C.A. § 40-13-202; see also Hammonds, 30 S.W.3d at 300 (stating that "indictments which achieve the overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements"). This court has held that an indictment that cites to Code section 39-17-1324 but does not name the predicate felony may not be sufficient to provide adequate notice of the crime charged because of the "multiple possible predicate felonies" specified in the statute. State v. Willie Duncan, No. W2013-02554-CCA-R3-CD, 2014 WL 4243746, at *6 (Tenn. Crim. App. Aug. 27, 2014) (citation omitted), perm. app. granted (Tenn. Feb. 13, 2015).[6]

Here, Perrier was indicted for only one offense, attempted second degree murder in Count 1, that constituted a "dangerous felony" pursuant to the statute. The last page of the indictment clearly listed all of Perrier's charges. In order to determine which dangerous felony would serve as the predicate offense for the employment of a firearm charge in Count 2, Perrier only had to refer back to Count 1 or peruse the indictment or the list of charged offenses to determine that the only dangerous felony with which he was charged was the attempted second degree murder offense in Count 1.

A review of Count 2 of the indictment shows that it was not void because it served its "overriding purpose" of providing notice to Perrier. When an indictment includes only one count that constitutes a dangerous felony under Code section 39-17-1324, the indictment is not void for lack of notice. Compare State v. Christopher Swift, No. W2013-00842-CCA-R3-CD, 2015 WL 2128782, at *18 (Tenn. Crim. App. May 5, 2015) (holding that "although count 3 of the indictment did not specify the predicate felony, the indictment alleged only one other offense, that of attempted first degree murder in count

---

[6] The Tennessee Supreme Court granted the State's application for permission to appeal on the issue of whether the State must name the predicate felony in an indictment count charging a defendant with violating Code section 39-17-1324. See State v. Willie Duncan, No. W2013-02554-SC-R11-CD (Tenn. Feb. 13, 2015) (order).

2, that qualified as a dangerous felony pursuant to Tennessee Code Annotated section 39-17-1324(i)(1)" and that "the State's failure to specify the predicate felony did not void the indictment"), perm. app. filed (Tenn. July 2, 2015), and Demeko Gerard Duckworth, 2013 WL 1933085, at *22 (holding that because only one count in the indictment, attempted first degree murder, qualified as a dangerous felony under Code section 39-17-1324, "it [was] 'reasonably clear' that the charge of employing a firearm during the commission of a dangerous felony [was] connected to the count of attempted first degree murder such that the indictment [was] not void for lack of notice"), with Willie Duncan, 2014 WL 4243746, at *9 (concluding that an indictment for employment of a firearm during the commission of a dangerous felony that did not name the predicate felony was void for lack of adequate notice when the defendant was charged with multiple felonies that could qualify as dangerous felonies under Code section 39-17-1324), and State v. Alvin Brewer, No. W2012-02281-CCA-R3-CD, 2014 WL 1669807, at *30 (Tenn. Crim. App. Apr. 24, 2014) (holding that the count charging the defendant with employing a firearm during the commission of a dangerous felony was void for lack of adequate notice because no predicate felony was specified in the firearm counts and two possible felonies that qualified as dangerous felonies preceded the firearm count), perm. app. denied (Tenn. Sept. 18, 2014).

The record makes it clear that the attempted second degree murder offense, which was the only dangerous felony with which Perrier was charged in this case, served as the predicate felony for the employment of a firearm offense. Therefore, we conclude that Count 2 of the indictment was not void.

**IV.  Failure to Instruct on Necessity.**  Perrier contends that the trial court erred in failing to charge the jury on the defense of necessity. At trial, he testified that he feared for his life at the moment he fired the shots because he thought Teone Vasser was pulling a gun from his back pocket. Perrier asserts that in light of his testimony, a rational jury could have found that he "reasonably believe[d] [his] conduct [was] immediately necessary to avoid imminent harm" and that "[t]he desirability and urgency of avoiding the harm clearly outweigh[ed] the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness." T.C.A. § 39-11-609. He claims that this error was not harmless beyond a reasonable doubt because the jury would have acquitted him of all charges had it been instructed on necessity. The State counters that the defense of necessity is inapplicable to crimes of violence and that the evidence established that the harms in this case were equal. We agree with the State.

At the close of proof at trial, Perrier asked the trial court to instruct the jury on the defense of necessity, which the State opposed. The trial court declined to charge the jury on necessity:

-33-

I don't really think necessity is applicable in this situation. Necessity applies when, "The person reasonably believes the conduct is immediately necessary to avoid imminent harm," and 2, "The desirability and urgency of avoiding the harm clearly outweigh according to ordinary standards of reasonableness the harm sought to be prevented by the law prescribing the conduct."

First thing I'd say is I think self-defense covers this situation fully. Second thing I would say is that I don't think the proof shows or could be interpreted to show even considering the evidence in the light most favorable to the defendant necessity for multiple reasons.

Of course, . . . at the common law necessity could never . . . be a defense to homicide . . . and so I would think that it would not be a defense to attempted homicide. That's <u>State [v]. Robinson</u>, 622 S.W.2d 62 [Tenn. Crim. App. 1980]. It was an old—very old Tennessee case <u>Smith [v]. Brazelton</u>, . . . 48 Tenn[.] 44 [(Tenn. 1870)] where it looked like maybe [the defense of necessity] was applicable where . . . the loss of two lives could be greater than the loss of one life.

But the [M]odel [P]enal [C]ode Section 3.02 [(1985),] its comments provide that when you're . . . weighing the harms that "[a]n equal or lesser harm will not suffice. The harm that you're trying to avoid actually must be greater . . . ." So anyway those are two things that give rise to an implication that this may not be applicable in a homicide case.

In this case you have to find that while I'm going to kill someone else and that harm is less than me getting killed. Here . . . when you weigh those harms they appear to be equal, [and do not meet the] requirement that the harm that . . . you're avoiding be greater than the harm that you're imposing.

So anyway for all those reasons I don't think necessity is applicable.

As we have noted, a defendant in a criminal case has a constitutional right to a correct and complete charge of the law, so that each issue of fact raised by the proof will be submitted to the jury on proper instructions. <u>See</u> <u>Dorantes</u>, 331 S.W.3d at 390. In determining whether a defense instruction has been fairly raised by the evidence, the court must examine the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor. <u>See</u> <u>Hawkins</u>, 406 S.W.3d at 129. "'When the instructions given by the trial judge are a correct statement of the law, and

the instructions fully and fairly set forth the applicable law, it is not error for a trial judge to refuse to give a special instruction requested by a party.'" State v. Dellinger, 79 S.W.3d 458, 497 (Tenn. 2002) (quoting State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987)).

Tennessee Code Annotated section 39-11-609, which codifies the common law defense of necessity, states that except as provided in Code sections 39-11-611 to 39-11-616, 39-11-620 and 39-11-621, conduct is justified if:

> (1) The person reasonably believes the conduct is immediately necessary to avoid imminent harm; and
>
> (2) The desirability and urgency of avoiding the harm clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

T.C.A. § 39-11-609.

The Sentencing Commission Comments for Code section 39-11-609 explain that the defense of necessity "excuses criminal liability in those exceedingly rare situations where criminal activity is an objectively reasonable response to an extreme situation." T.C.A. § 39-11-609, Sentencing Comm'n Cmts. The Comments explain:

> The defense is limited to situations: (1) where the defendant acts upon a reasonable belief that the action is necessary to avoid harm; and (2) where the harm sought to be avoided is clearly greater than the harm caused by the criminal act. The defense is further limited in application to those offenses where it is not expressly excluded by statute.
>
> Subdivisions (1) and (2) contemplate a balancing between the harm caused by the conduct constituting an offense, and the harm the defendant sought to avoid by the conduct. If the harm sought to be avoided was, by ordinary standards of reasonableness, clearly greater than the harm actually caused (the offense), the defendant's conduct causing the offense is justified.

Id. The Sentencing Commission also provided the following example: "[T]he necessity defense would bar a trespass conviction for a hiker, stranded in a snowstorm, who spends the night in a vacant cabin rather than risking death sleeping in the open." Id.

The defense of necessity is generally used "when the extreme situation is brought on by something other than a human act." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. Feb. 18, 1998) (citing Neil P. Cohen, et al., Prevalence and Use of Criminal Defenses; A Preliminary Study, 60 Tenn. L. Rev. 957, 966 (1993)). Other "[e]xamples of necessity include a ship violating an embargo law to avoid a storm, a pharmacist providing medication without a prescription to alleviate someone's suffering during an emergency, or where two sailors are shipwrecked and one pushes the other off the float to save his own life." Id. (citing 11 David L. Raybin, Tennessee Practice § 28.118 (1985 & Supp. 1997) (citations and footnotes omitted)). This court has declined to find error when a trial court refused to charge the defense of necessity in crimes of violence. See State v. Marcus A. Terry, No. 02C01-9708-CR00313, 1998 WL 775651, at *5-6 (Tenn. Crim. App., at Jackson, Nov. 6, 1998) (concluding that the defendant was not entitled to a necessity instruction when he testified that his friend pulled a gun on him, struck him, and told him to drive faster, which led to the death of two victims), perm. app. denied (Tenn. Apr. 26, 1999); State v. Albert Christian Padgett, No. 03C01-9704-CR-00138, 1998 WL 473884, at *5 (Tenn. Crim. App. Aug. 14, 1998) (holding that the defendant was not entitled to an instruction on the defense of necessity when the defendant testified that his co-defendant's aggression during the first aggravated robbery made him fearful the co-defendant would kill him if he did not participate in the other crimes, including rape of the victim).

Here, Perrier has not demonstrated that a non-human act caused him to fire the shots in this case or that the harm sought to be avoided was greater than the harm caused by his criminal act. Moreover, the self-defense instruction was the proper instruction given the evidence presented at trial. Because the jury instructions fairly submitted the legal issues to the jury, Perrier is not entitled to relief on this issue.

**V.  Sufficiency of the Evidence.**  Lastly, Perrier argues that the proof is insufficient to support his conviction for assault in Count 8. He claims that because Shadaq Sharhan was standing behind bulletproof glass at the time he fired the shots, "no reasonable juror could have concluded that Mr. Sharhan reasonably feared imminent bodily injury." We agree with the State that the evidence was sufficient to sustain this conviction.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d

883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Dorantes, 331 S.W.3d at 379 (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. Id.

Although Perrier was charged in Count 8 with aggravated assault, he was found guilty of the lesser included offense of assault, a Class A misdemeanor. The indictment charged Perrier with committing aggravated assault against Shadaq Sharhan by causing Sharhan to reasonably fear imminent bodily injury through the use or display of a deadly weapon. See T.C.A. §§ 39-13-101, -102 (Supp. 2009). Therefore, in order to sustain a conviction for the lesser included offense of assault, the State was required to prove that Perrier intentionally or knowingly caused Sharhan to reasonably fear imminent bodily injury. See id. § 39-13-101(a)(2) (Supp. 2009). "Bodily injury" is defined to include "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Id. § 39-11-106(a)(2) (Supp. 2009).

"Circumstantial evidence is sufficient to establish a victim's fear of imminent bodily injury." State v. Lonta Montrell Burress, Jr., No. E2013-01697-CCA-R3-CD, 2014 WL 6855226, at *8 (Tenn. Crim. App. Dec. 4, 2014) (citing State v. Jessie James Austin, No. W2001-00120-CCA-R3-CD, 2002 WL 32755555, at *5 (Tenn. Crim. App. Jan. 25, 2002)). This court has held that the fear element is satisfied "if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury." State v. Gregory

Whitfield, No. 02C01-9706-CR-00226, 1998 WL 227776, at *2 (Tenn. Crim. App. May 8, 1998) (citing State v. Jamie Lee Pittman, No. 03C01-9701-CR-00013, 1998 WL 128801, at *5 (Tenn. Crim. App., at Knoxville, Mar. 24, 1998)). "A victim's fear may be inferred from circumstances surrounding the offense, even if the victim does not testify at trial." Lonta Montrell Burress, Jr., 2014 WL 6855226, at *9 (citing State v. Barry Smith, No. W2011-02122-CCA-R3-CD, 2013 WL 6388588, at *14 (Tenn. Crim. App. Dec. 5, 2013)).

Initially, we agree with the State's assertion that Perrier should not be able to "immunize his conduct based on [Sharhan's] foresight in having installed defenses against assaults." See United States v. Whitfield, 695 F.3d 288, 304 n.11 (4th Cir. 2012) (joining the Second and Eleventh Circuits "in rejecting the contention that bank tellers are not jeopardized simply because they are situated behind 'bulletproof' glass"); United States v. Tutt, 704 F.2d 1567, 1568-69 (11th Cir. 1983) (holding that the defendant's actions were sufficient to warrant a conviction for bank robbery and incidental crimes under 18 U.S.C.A. § 2113 despite the fact that the bank employee was shielded during the robbery by a plastic bulletproof barrier); United States v. Johnson, 401 F.2d 746, 747 (2nd Cir. 1968) (concluding that the evidence was sufficient to sustain a conviction for 18 U.S.C.A. § 2113 even though the defendant's bullet failed to penetrate the bulletproof area surrounding the teller); State v. Borbon, 706 P.2d 718, 723 (Ariz. 1985) (concluding that the defendant's use of a tire iron constituted a dangerous instrument readily capable of causing death or serious physical injury sufficient for an armed robbery conviction despite the fact that the cashier's booth was made of bulletproof glass that could not be shattered); People v. Valdez, 220 Cal. Rptr. 538, 544 (Cal. Ct. App. 1985) (holding that "a defendant can commit the crime of assault[, which in California requires the present ability to injure the victim,] even though his intended victim, unknown to him, has thrown up an apparently impervious defense [of a bulletproof barrier]").

Viewed in the light most favorable to the State, the evidence presented at trial was sufficient for a rational jury to conclude beyond a reasonable doubt that Perrier intentionally or knowingly caused Sharhan to reasonably fear imminent bodily injury. Sharhan testified that he "hear[d] . . . the shooting . . . and [he] hear[d] the girl . . . start crying and [he] s[aw] the blood [o]n the floor." He added that although he "didn't see the shooter," he "press[ed] the emergency button" and "tr[ied] to help the girl [who had been shot]." When Sharhan was asked if he was scared when he heard these shots, Sharhan replied, "Yeah, [this was the] first time it [had] happened." Sharhan, who did not know why the gunshots were being fired, saw that shots were coming through the front door of the store, observed the glass in the front door breaking, and knew that one of his customers had been shot. Although Sharhan admitted he was standing behind bulletproof glass at the time the shots were fired, he said he tried to help the girl that had been shot by bringing her ice and napkins to slow the bleeding. Several other witnesses testified to

the chaotic atmosphere in the store at the time of the shooting. T.T., the eight-year-old girl who sustained the gunshots wounds, testified that she heard arguing inside and outside the store before the gunshots were fired. T.S., the girl's mother, testified that her daughter was standing behind Teone Vasser when "all of a sudden [there was] shooting all over the place." Faith Taylor, Perrier's girlfriend, testified that Perrier pulled the gun from the back of his pants and immediately began firing gunshots at Teone Vasser who was standing directly in front of the store that contained several people. Given this evidence, a rational trier of fact could have found that Sharhan reasonably feared imminent bodily injury both at the time that he was behind the bulletproof glass and at the moment when he left this bulletproof area to help the young girl who had been shot. Accordingly, we conclude that the State presented sufficient evidence to sustain Perrier's assault conviction in Count 8.

## CONCLUSION

We conclude that although the self-defense instruction was erroneous, the error was harmless. Therefore, based on the aforementioned authorities and reasoning, we affirm the judgments of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE

-39-